UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                        :

CARA VITALE                :           3:19 CV 427 (RMS)
                        :
V.                        :
                        :
ANDREW SAUL,          :
COMMISSIONER OF     :
SOCIAL SECURITY[1]     :          DATE: MARCH 20, 2020
                        :
------------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION
OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

disability insurance benefits ["DIB"].

I.     ADMINISTRATIVE PROCEEDINGS

On October 12, 2016, the plaintiff filed an application for DIB, claiming she had been

disabled since February 19, 2013, due to "back injury, arthritis in the spine, nerve i[m]pinchment,

and disk herniation." (Certified Transcript of Administrative Proceedings, dated December 17,

2019 ["Tr."] 69, 176-77). The plaintiff's application was denied initially, (Tr. 68-83), and upon

reconsideration. (Tr. 85-95). On March 28, 2018, a hearing was held before Administrative Law

Judge ["ALJ"] John T. Molleur, at which the plaintiff and Ms. Susan Gaudet, a vocational expert,

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security.  (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d).  The Clerk of the Court shall amend the caption in this case as indicated above.

testified. (Tr. 31-66). The plaintiff was represented by an attorney at the hearing. (*Id.*). On May 1, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 15-26). The plaintiff filed a request for review of the hearing decision on May 30, 2018, (Tr. 172-75), and, on January 23, 2019, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On March 21, 2019, the plaintiff filed her complaint in this pending action (Doc. No. 1). On April 15, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to the undersigned. (Doc. No. 11). On May 17, 2019, the defendant filed the administrative transcript. (Doc. No. 12). The plaintiff filed her Motion to Reverse on July 18, 2019, (Doc. No. 14), with a Statement of Material Facts (Doc. No. 14-1), and brief in support. (Doc. No. 14-2 ["Pl.'s Mem."]). On September 16, 2019, the defendant filed his Motion to Affirm, (Doc. No. 15), with a Statement of Material Facts (Doc. No. 15-2), and brief in support. (Doc. No. 15-1 ["Def.'s Mem."]). For the reasons stated below, the plaintiff's Motion to Reverse (Doc. No. 14) is *denied*, and the defendant's Motion to Affirm (Doc. No. 15) is *granted.*

## II.    FACTUAL BACKGROUND

### A.    HEARING TESTIMONY

At the time of her hearing, the plaintiff was 35 years old and was living with her husband and twin boys in North Haven, CT. (Tr. 40-41). The plaintiff's twins were "about to be three" and were both autistic. (Tr. 40). The plaintiff testified that her husband, who worked outside the home, "change[d] to a night shift so he would be home during the day for [their] children." (Tr. 41). The plaintiff and her husband shared the household chores: she would dust, clear off and wash the counters, pick up items that had been left on higher surfaces, and fold the laundry because she

could not bring hampers up and down the stairs or bend down to load the dryer. (Tr. 50-51). Either her husband or her mother-in-law would clean the bathtub and toilet, and vacuum. (Tr. 51).

The plaintiff completed high school and some college level classes. (*Id.*). She previously worked as a nursing assistant at Masonicare. In February 2012, she sustained a work injury when she "was suddenly pulled into flexion, by her collar, by a resident who was falling." (Tr. 242). She was placed on short-term disability leave and received Worker's Compensation. (Tr. 42). She was cleared for sedentary work on January 7, 2013, (Tr. 286), but Masonicare terminated her employment in February 2013 because she could not "come back to full duty." (Tr. 41-42). She testified that, at the time of her injury, she had been trying to become a registered nurse. (Tr. 41). She had not worked since February 2013. (*Id.*).

The plaintiff testified that her "sciatica [was] very sensitive" so she had to "be very careful about how [she] [did] things day to day." (Tr. 45). She explained that she had "numbness in [her] right foot," so she had to be careful especially climbing stairs or walking on uneven ground. Any tripping or falling created a "jarring motion," which "aggravate[d] not just the back pain, but [also] the sciatica," which could be "extreme." (*Id.*). When asked to rate her general level of pain on a scale of one to ten, the plaintiff responded that it "very much depends on the time of day" and her "ability to move around." (*Id.*). At home, she can "keep [herself]" to a six. (*Id.*). She could sit in a regular chair for "around a half an hour" before she would start to feel "the exacerbation of the sciatica down [her] [right] leg" and need to move around. (Tr. 45-46). She would need to move around for "probably ten minutes or so." (Tr. 46). She explained, however, that typically "once [she] got[] to the point where [she] fe[lt] . . . a potential for exacerbating . . . she [would] go and [lie] down." (*Id.*). She would lie down for "[u]sually at least an hour." (*Id.*).

She also testified that she could stand for "[m]aybe half hour, 45 minutes" if she had "something to lean against." (*Id.*). After standing for 30 to 45 minutes, she would need to "[s]it comfortably" in "a recliner chair" or "[lie] down." (Tr. 47). She could walk "on a nice flat area" for "20 minutes or so" before needing to sit down and rest. (*Id.*). She explained if she pushed herself too much, she would experience an exacerbation of symptoms, both of her back pain and sciatica. (Tr. 47-49).

When asked the amount of weight she could comfortably lift, the plaintiff testified that "it would depend on from where." (Tr. 49). She explained that lifting an item from the floor was "not something [she] could really do," but if it was on the counter, or in the refrigerator, such as a gallon of milk, she could lift it. (*Id.* ("I mean I get a gallon of milk out of the refrigerator, and you know, that's acceptable")). When asked if she could lift a gallon of milk repetitively, she responded that she had "never noted any inability to do it throughout the day." (Tr. 50). She also had trouble bending down. *See* Tr. 50 ("Generally, you know, if something falls and I need to get one thing if I'm careful and I brace myself on something, you know, I can get it, but multiple times, no. I wouldn't be able to pick up multiple items."). The plaintiff testified that she was "60 to 70%" slower than she used to be before her injuries. (Tr. 52). She could go to the grocery store to pick up one or two items but did not "do the full grocery shopping" because "pushing the cart" and "bending down to get lower items" was difficult. (*Id.*). She could drive for "short distances," but had problems with longer distances because "[she could not] move" her right leg like she needed to relieve symptoms. (Tr. 53). She also noted that she would get "spasms" on "the top of [her] foot up [her] shin" which affected her ability to drive. (*Id.*). She testified that her pain affected her ability to concentrate and to focus; she felt tired "all of the time." (Tr. 53-54). She spent 16-18 hours each day laying down. (Tr. 54). She had not been able to lift her children in and out of their

cribs when they were younger. (Tr. 55). She could microwave them meals, change their diapers on the couch, and read them books, but she could not take them to the park. (Tr. 55).

The plaintiff testified that she did not think she would be able to attend a job every day. (Tr. 56). She estimated that she would be out on a monthly basis. (*Id.*). She also did not think she would be able to consistently focus throughout the day. (Tr. 56-57).

A vocational expert ("VE") testified at the plaintiff's hearing that the plaintiff's past work at Masonicare corresponded to a nursing assistant, an occupation customarily performed at the medium exertional level, but performed at the light exertional level as reported by the plaintiff. (Tr. 61-62). The ALJ then asked the VE to assume the following hypothetical individual: an individual of the plaintiff's age, education, and work background, limited to performing sedentary work, who must avoid climbing of ladders, ropes or scaffolds, must avoid exposure to higher concentrations of vibrations, and could tolerate no more than occasional exposure to extremes of cold. (Tr. 62). Such individual would also be limited to performing other postural activities only occasionally. (*Id.*). The VE testified that the hypothetical individual described above could not perform the plaintiff's past work. (*Id.*). Such individual could, however, perform the following unskilled occupations: (1) "addresser," 11,000 jobs nationally; (2) "ticket checker," 10,000 jobs nationally; and (3) "order clerk, food and beverage," 30,000 jobs nationally. (*Id.*).

The ALJ then asked the VE whether the hypothetical individual, if she needed to alternate positions "between sitting or standing, walking approximately every 30 minutes while remaining at the workstation," could still perform those occupations. (Tr. 62-63). In response, the VE testified that, with this additional limitation, the individual would only be able to work as a food and beverage order clerk. (Tr. 63).

For the next hypothetical, the ALJ kept all the limitations described above, and he also asked the VE to assume that the individual would require unscheduled breaks or would be off task due to complications arising from the diagnosed conditions for approximately 60-90 minutes per day over scheduled breaks, requiring those breaks three times each week. (Tr. 63). The VE testified that the individual could not perform any jobs in the national economy. (*Id.*). Finally, the ALJ asked the VE to assume that the hypothetical individual, instead of taking unscheduled breaks or engaging in off-task behavior, would be absent from work entirely two to three days each month. (Tr. 63-64). The VE testified that such an individual would likewise not be able to perform any jobs in the national economy. (Tr. 64).

## B. MEDICAL HISTORY

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statements of Material Facts. (Doc. Nos. 14-1, 15-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

### 1. Pre-Onset Date Records

On August 11, 2011, the plaintiff presented to Dr. Jeffrey Goldberg, complaining of lower back pain that had been bothering her for a month. (Tr. 1258). On September 7, 2011, Dr. Peter Whang wrote a letter to Dr. Jeffrey Goldberg, informing him that he completed an orthopedic spinal evaluation of the plaintiff. (Tr. 947-48). The plaintiff had reported to Dr. Whang that she had been experiencing right lower extremity pain, numbness and weakness for three months. (Tr. 947). She described pain and numbness radiating from her right buttock into her right lateral thigh and calf, as well as into her right foot. (*Id.*). She rated her pain as seven to nine out of ten and stated that her pain was sharp, shooting and aching, and worse with sitting, bending, and coughing. (*Id.*).

The pain improved when she stood up, walked, or took medication. (*Id.*). Dr. Whang explained that the plaintiff had "undergone a number of conservative treatments including anti-inflammatories, prescription pain medications as well as a Medrol Dosepak." (*Id.*). On examination, the plaintiff walked with an antalgic gait on her right lower extremity, but she did not require any assistive devices. (Tr. 948). She had difficulty performing ten single heel raises on her right lower extremity and had mild diffuse tenderness to palpation over her lower lumbar spine. (*Id.*). She had some restriction in the range of motion of her lumbar spine and a positive straight leg raising test[2] on the right. (*Id.*). She had five out of five strength in all muscle groups. (*Id.*). Dr. Whang assessed right lower extremity sciatica with pain, numbness and weakness. (*Id.*). He recommended a discectomy. (*Id.*).

On February 16, 2012, the plaintiff returned to Dr. Whang. (Tr. 953). Treatment notes reflect that the plaintiff had underwent a right S1 selective nerve root injection on September 26, 2011, which led to "almost complete resolution" of her lower extremity complaints. (Tr. 953). She was "essentially symptom free" until February 12, 2012, when a patient at work grabbed her scrub top, leading her to sustain an injury to her lumbar spine. (*Id.*). She began experiencing worsening pain in her back with radiation primarily into her right lower extremity, though she had symptoms in her left leg as well. (*Id.*). She rated her pain level as an eight out of ten and stated that her symptoms were "sharp and shooting." (*Id.*). Her pain worsened when sitting and improved when she took medications and a muscle relaxant. (*Id.*). On examination, she had a mildly antalgic gait on her right lower extremity, but she did not require any assistive devices. (*Id.*). She had mild diffuse tenderness to palpation over her lower lumbar spine in her right buttock, "somewhat

---

[2] A straight leg raise test is a neurodynamic test used to check patients for physical signs of disc herniation. *Straight Leg Raise Test*, PHYSIOPEDIA, https://www.physio-pedia.com/Straight_Leg_Raise_Test (last accessed on Mar. 16, 2020). The clinician lifts the patient's leg by flexing at the hip until the patient complains of pain or tightness in the back of back of the leg. (*Id.*).

limited" range of motion of her lumbar spine, and a positive straight leg raising test on the right. (*Id.*). Dr. Whang believed her symptoms were consistent with radiculopathy and ordered an MRI to assess whether she would be a candidate for "repeat S1 selective nerve root injection" or surgery. (Tr. 954).

A February 18, 2012 MRI revealed "[m]ild multilevel degenerative changes," with a "right paracentral disc extrusion at the L5-S1 level causing mild central canal and right neuroforaminal narrowing." (Tr. 1086-87). On February 21, 2012, the plaintiff again saw Dr. Whang. (Tr. 310-11). She rated her pain as a five out of ten. (Tr. 311). She described her pain as "sharp and aching"; the pain worsened with sitting, bending and crouching, but improved with walking and taking oral steroids. (*Id.*). On examination, the plaintiff had normal range of motion of the lumbar spine with some mild discomfort in her right buttock with lumbar flexion. (*Id.*). She had a positive straight leg test on the right but no obvious weakness in her lower extremities. (*Id.*). She walked with a mildly antalgic gait on the right lower extremity but did not require an assistive device. (*Id.*). Dr. Whang assessed right lower extremity sciatica and right paracentral disc extrusion at L5-S1 with right S1 radiculopathy. (Tr. 312). Dr. Whang discussed treatment options with the plaintiff, including continuing conservative treatment and considering surgical intervention. (*Id.*).

On February 24, 2012, the plaintiff saw Dr. Kenneth M. Kramer, an orthopedist. (Tr. 242-43). The plaintiff reported "no significant improvement," that she was "uncomfortable in all positions," but most pronounced "with sitting." (Tr. 242). On examination, she showed a "marked right antalgia referable to the right lower extremity," "significant flexion limitation producing right sciatic stretch," and significant right straight leg raise. (*Id.*). Dr. Kramer discussed epidural injections and physical therapy. (Tr. 243).

The plaintiff returned to Dr. Kramer on March 22, 2012; she reported improvement after an epidural injection, but she continued to show "right antalgia" and "significant right-sided stretch signs with forward flexion and with straight leg raising." (Tr. 244).

Treatment notes from April 9, 2012 reveal that "[s]ignificant sciatica persists," with continued antalgia and significant sciatic stretch and straight leg raising. (Tr. 245). On April 23, 2012, the plaintiff returned to Dr. Kramer after a second epidural injection, reporting "50% to 75%" improvement" with much better tolerance for sitting and activities. (Tr. 249). On examination, her antalgia had resolved, her lumbar motion had improved, and her straight leg raising was mild. (*Id.*). Dr. Kramer cleared her to return to work on a sedentary basis. (*Id.*).

Treatment notes from May 7, 2012, May 31, 2012, June 21, 2012 reflect continued improvement but that the plaintiff's sciatica persisted, and she needed to remain on a sedentary restriction. (*See* Tr. 251, 253, 254). In June 2012, she reported recurrent escalation of the sciatica and noted that she was considering surgery. (Tr. 254, 257). In July 2012, she reported "ongoing significant sciatica, some good days but with significant sciatica quickly arising with physical activities." (Tr. 258).

At appointments in August 2012, the plaintiff's right sciatica persisted. (Tr. 261-62). Examinations showed right antalgia, flexion producing right sciatic stretch signs and significant right straight leg raising. (*Id.*).

A September 19, 2012 MRI of the plaintiff's lumbar spine showed "[d]egenerative change with right paramidline disc protrusion at L5-S1" and a "[l]arge left adnexal mass," which was suspected to be a dermoid. (Tr. 265). At appointments in September 2012 and October 2012, the plaintiff reported continuing sciatica; examination results were largely unchanged. (Tr. 266, 268). She remained on a sedentary restriction.

On November 2, 2012, the plaintiff underwent a right L5-S1 laminotomy, discectomy, and nerve decompression for "chronically debilitating right sciatica." (Tr. 269). On November 12, 2012, the plaintiff saw Dr. Kramer for a post-operative visit. (Tr. 275). She reported "improving status" but had "current buttock and thigh pain" and "residual postop low back pain." (*Id.*). On examination, her gait was normal, she had "diminished right sciatic stretch signs," and she was neurologically intact. (*Id.*). She was fitted with a lumbar corset. (*Id.*). Treatment notes from November 26, 2012 reflect continued improvements, though she had intermittent right thigh pain. (Tr. 278). On December 17, 2012, she reported "gradual progress." (Tr. 285). Dr. Kramer noted that she had been attending physical therapy; on examination, her antalgia "remain[ed] much diminished," her "lumbar motion improved with diminished sciatic stretch and tenderness," and she was neurologically intact. (*Id.*). Dr. Kramer cleared her for sedentary work on January 7, 2013. (Tr. 286). At that appointment, she had a normal gait, mild straight leg raising, lumbar motion producing moderate lumbosacral pain, and was neurologically intact. (*Id.*). On February 4, 2013, the plaintiff reported to Dr. Kramer that she had improved but was "frustrated by the persistence of the residual buttock sciatica" with prolonged sitting. (Tr. 291). She also had "occasional distal radiation to the plantar right foot." (*Id.*). On examination, she "ambulat[ed] well" but "still with residual sciatic stretch signs" and "sciatic notch tenderness." (*Id.*). Dr. Kramer recommended another epidural injection. (*Id.*). She remained on a sedentary restriction. (*Id.*).

## 2.     Records Within the Period of Disability

On February 19, 2013, the plaintiff had a significant "flaring of pain since having to work extended shifts." (Tr. 293). Examination showed discomfort and antalgia, but with negative straight leg raising. (*Id.*). Treatment notes from February 28, 2013 and March 14, 2013 reflect

persistence of symptoms; examinations showed antalgia and right sciatic notch tenderness. (Tr. 294, 1384).

On March 28, 2013, the plaintiff reported a 50% improvement after her March 20, 2013 epidural injection. (Tr. 334-35). She was "now comfortable with walking and standing." (Tr. 355). On examination, her gait was normal, her motion improved, and there was diminished tenderness and sciatic stretch. (*Id.*).

On April 2, 2013, the plaintiff returned to Dr. Whang for low back pain. (Tr. 306-08). She reported that her left lower extremity sciatica had worsened over the past several months while her right lower extremity symptoms were stable. (Tr. 306). On examination, she walked with an antalgic gait, had "significantly limited range of motion of [her] lumbar spine secondary to pain in her back and right buttock with both extreme flexion and extension," had "mild diffuse tenderness with palpation over [her] lower lumbar spine," a "positive straight leg raising test bilaterally, more prominent on the right," some "decreased sensation along the lateral aspect of her right calf," and "diffusely decreased strength throughout her right leg." (*Id.*). Dr. Whang recommended an MRI of her lumbar spine to rule out recurrent disc herniation or nerve compression. (Tr. 308). An April 24, 2013 MRI of the plaintiff's lumbar spine revealed "residual/recurrent subligamentous right paracentral disc extrusion abutting the exiting right S1 nerve root and causing minimal narrowing of the right neural foramina but no significant spinal canal stenosis." (Tr. 638-39).

The plaintiff returned to Dr. Whang on May 14, 2013. (Tr. 303-05). She rated the pain in the right side of her back as a six out of ten; the pain was constant and was aggravated by standing, walking, bending and exercise. (Tr. 303). She walked with an antalgic gait, had "severely limited range of motion of her lumbar spine with pain in her back and right leg with flexion," had "diffuse tenderness with palpation over her lower lumbar spine and her right buttock," and had a positive

straight leg raising test on the right but a negative test on the left. (Tr. 304-05). She also had difficulty performing ten single heel raises on her right leg. (Tr. 305). Dr. Whang diagnosed "axial low back pain, with right lower extremity sciatica" and "recurrent disk herniation, at L5-S1, with severe disk degeneration." (*Id.*). Dr. Whang recommended further surgery in the form of a stabilization procedure, such as a transforaminal lumbar interbody fusion. (*Id.*).

On May 17, 2013, the plaintiff saw Judith L. Gorelick, M.D., for a neurosurgical consultation. (Tr. 317-19). She reported persistent pain. (Tr. 317). Treatment notes reflect that the plaintiff was "very symptomatic when rising from a seated position," had full strength throughout her lower extremities, had a "significantly positive straight leg raise test on the right," and "ambulate[d] with a severely antalgic gait." (Tr. 317-18). She also had difficulty standing upright and repetitively rising onto the right toes, which she could do easily on the left, suggesting subtle plantar flexion weakness. (Tr. 318). Dr. Gorelick diagnosed "residual or recurrent right L5-S1 herniated nucleus pulposis" and recommended a "redo microdiscectomy." (*Id.*).

The plaintiff visited Dr. Gorelick again on July 31, 2013. (Tr. 320-22). The plaintiff's reported symptoms and examination results were largely unchanged, except she walked with a mildly antalgic gait. (Tr. 320). Dr. Gorelick noted "significant radiculopathy" in her right leg. (*Id.*). She opined that the plaintiff may need a fusion surgery, but given her young age, a redo discectomy should be attempted first before proceeding with a fusion surgery. (Tr. 321). At a follow-up visit to Dr. Gorelick on October 16, 2013, the plaintiff's reported symptoms and examination results were largely the same, except that she ambulated with a steady gait. (Tr. 323-24).

On January 3, 2014, the plaintiff returned to Dr. Gorelick. (Tr. 325-26). Treatment notes reflect that the plaintiff had been scheduled for a discectomy but had canceled the procedure. (Tr. 325). The plaintiff reported continued pain in her back and right leg; the back pain had gotten

progressively worse and now exceeded the leg pain. (*Id.*). She reported being unable to bend, lift, push or pull. (*Id.*). On examination, she had normal power in her lower extremities, a positive straight leg raise test on the right, and ambulated with an antalgic gait. (*Id.*). A sensory examination showed "light hypesthesia in the lateral aspect of her right calf and foot." (*Id.*). Her lumbar range of motion was to "80 degrees in flexion, 25 degrees in extension and lateral bending." (*Id.*). She had "diffuse tenderness to palpation of the lumbar spine at waist level, both in the midline and along the lumbar paraspinal muscles," but "no palpable spasm." (*Id.*). She told Dr. Gorelick that she was emotionally unable to move forward with surgery given the recent passing of her father. (Tr. 326).

On June 6, 2014, the plaintiff presented to Dr. Goldberg complaining of anxiety and lower back pain. (Tr. 1233). She sought medication for inflammation of her back that she could take for an upcoming trip to Italy. (*Id.*). She continued to complain of "recurrent right-sided low back pain radiating down the right leg." (*Id.*). Examination revealed good range of motion of the plaintiff's "trunk" but a positive straight leg raising test on the left side. (Tr. 1234).

The plaintiff returned to Dr. Goldberg on September 16, 2015, reporting lower back pain after a fall off a small ladder. (Tr. 1247-49). Her back pain had progressively worsened since she gave birth in June 2015. (Tr. 1247). Dr. Goldberg noted that she was "in apparent back discomfort" during the visit; he "observed her repeatedly repositioning herself to relieve the back ache." (Tr. 1248). On examination, she had a normal gait, but her lumbar spine did not demonstrate full range of motion. (*Id.*).

The plaintiff saw Melissa A. Mileszczanski, PA-C, on October 8, 2015, for low back pain, radiating leg pain, and buttock pain. (Tr. 336-37). Her pain was "sharp, throbbing and numb in quality, moderate to severe in intensity, and constant in duration." (Tr. 336). The plaintiff reported

exacerbation of chronic low back pain that had flared up in the last three months. She also began having sciatic symptoms—pain radiating down her right leg into her foot and occasional tingling and numbness—on October 7, 2015. (*Id.*). She mentioned that her symptoms were "under control" but had increased at the end of her pregnancy in June 2015. (*Id.*). On examination, she walked with a mild antalgic gait, and she had "tenderness over the right sacroiliac joint and the right lumbar paravertebral region," "limited forward flexion with pain," "extension with pain," and "good bilateral side bending without pain." (*Id.*). She was also able to heel walk and toe walk, she had full range of motion of her lower extremities, and her strength in the lower extremities was five out of five bilaterally. (*Id.*). A straight leg raise test was positive on the right. (*Id.*). That same day, the plaintiff saw APRN Jillian Ross complaining of the same symptoms. (Tr. 373).

On October 12, 2015, the plaintiff saw Dr. Kramer for low back pain, radiating leg pain, and buttock pain. (Tr. 338). She had "developed acute right sciatica." (*Id.*). She described her pain as "sharp, throbbing, and numbing in quality, moderate to severe in intensity, and constant in duration." (*Id.*). Examination showed "right antalgic, L5 motion producing right LS pain," "sciatic notch tenderness," and "positive right straight leg raising." (*Id.*). An October 19, 2015 MRI of the plaintiff's lumbar spine showed "[d]egenerative change with large posterior right paramidline disc extrusion at the L5-S1 level." (Tr. 339).

Four months later, on February 15, 2016, the plaintiff returned to Dr. Kramer for a follow-up on her low back pain. (Tr. 341). Treatment notes reflect that she had "lower back pain" and "significant but predominant right lower extremity numbness." (*Id.*). Dr. Kramer diagnosed a herniated lumbar disc. (*Id.*). She returned to Dr. Kramer on February 29, 2016, for treatment of her lower back pain. (Tr. 342). Dr. Kramer prescribed medications. (*Id.*). The plaintiff was "more comfortable," she "walk[ed] with greater ease," her "lumbar motion [was] improved with less

pain," and she had "diminished sciatic stretch signs." (*Id.*). The plaintiff reported to Dr. Kramer on April 1, 2016 that her symptoms had improved with the medications. (Tr. 343). Treatment notes reflect that her "right sciatica . . . ha[d] now fully resolved aside from residual intermittent toe numbness." (*Id.*). Her lower back pain "persisted," but was "mainly bothersome at night which she manage[d] with a couple of Ultram tabs." (*Id.*). Her gait was normal, and she had "no root signs," but she had lumbosacral pain with motion. (*Id.*).

On May 9, 2016, the plaintiff returned to Dr. Kramer. (Tr. 344). Treatment notes reflect that "the right L5-SI extrusion symptoms" had "much improved." (*Id.*). She reported that "the situation [was] status quo," that her "sciatic[a] favorably much improved with minimal symptoms," and that "the only problem [was] of continued activity related lower back pain." (*Id.*). She ambulated "well," had "no root signs," and her lumbar motion was "satisfactory." (*Id.*). Dr. Kramer noted that the absence of the sciatica rendered the "situation nonsurgical." (*Id.*).

Treatment notes from July 6, 2016 reflect that the plaintiff had residual low back pain, but that her sciatica "remain[ed] absent." (Tr. 345). The back pain was "bothersome" and had been interfering with her sleep. (*Id.*). Her gait was normal, her lumbar motion was "in the satisfactory range," and she had lumbosacral junction pain at full range with deep tenderness but no root signs. (*Id.*).

Treatment notes from July 27, 2016 similarly reflect that the plaintiff's sciatica had abated but her low back pain persisted. (Tr. 346). Dr. Kramer prescribed medications. (*Id.*). Her gait was normal, but her "lumbar motion [was] producing bilateral facet region pain in extension with rotation with facet region tenderness," with no root signs. (*Id.*). Dr. Kramer recommended facet injections. (*Id.*). On August 5, 2016, Dr. Kramer examined the plaintiff under fluoroscopy and

diagnosed her with osteoarthritis of the spine without myelopathy or radiculopathy in the thoracolumbar region. (Tr. 347).

The plaintiff saw Keera Bhandar, PA-C, on August 27, 2016. (Tr. 367). She complained of worsening lumbar pain and sciatica pain that radiated into her right thigh. (*Id.*). On examination, there was tenderness to palpation of the lumbar vertebrae but no swelling. (*Id.*). She had an "uneven stance, placing most of her weight on her left side." (*Id.*). She was unable to climb onto the exam table because extension of the right leg caused pain to shoot down past her right knee. (*Id.*).

She saw Dr. Kramer four days later. (Tr. 348). At that appointment, she reported the recurrence of sciatica on the right side as well as persistent lower back pain. (*Id.*). On examination, she was "uncomfortable in appearance" and "guarding." (*Id.*). She had "right sciatic signs," "sciatic notch tenderness," "stretch signs," and "motion producing bilateral right greater than left lumbar pain." (*Id.*).

At her next appointment on September 28, 2016, the plaintiff's right-side sciatica continued. (Tr. 352). She reported "ongoing significant daily right sciatic symptoms[,] particularly at the end of the day," but "no significant left-sided symptoms" and no "motor complaints," though she had "frequent numbness of the right foot." (*Id.*). Examination showed a "satisfactory" gait pattern, but "lumbar motion producing right sciatic stretch" with a positive straight leg raising on the right side. (*Id.*). Dr. Kramer discussed surgery but noted that the plaintiff found surgery "infeasible" because of financial difficulties. (*Id.*).

On October 14, 2016, the plaintiff reported to Dr. Kramer "some benefit" from her medications; however, she continued to have right sciatica. (Tr. 354). Her gait was normal, and she had "mild sciatic stretch signs." (*Id.*). She returned on November 10, 2016, reporting "mild

benefit" from her medication, with a "fluctuating level of symptoms which ha[d] been a bit more manageable albeit still bothersome." (Tr. 353). Her gait was normal and her motion satisfactory, with mild stretch signs. (*Id.*).

The plaintiff next presented to Dr. Kramer on May 24, 2017, for increased right sciatica. (Tr. 1368). She reported an escalation of symptoms in the "past few weeks." (*Id.*). On examination, she had "right antalgic" and "significant right sciatic stretch signs, negative on the left." (*Id.*).

On July 24, 2017, the plaintiff returned to Dr. Kramer. (Tr. 1367). She reported that the sciatica flareup "had subsided," but that she was "frustrated by residual baseline symptoms of the foot in particular, specifically plantar paresthesias[,] that render[ed] ambulation awkward at times." (*Id.*). Her gait was "mildly antalgic" on the right, and she had a minimal straight leg raising test on the right. (*Id.*). Dr. Kramer noted that "the only remaining definitive measure would be discectomy" based on an updated MRI. (*Id.*).

C.      OPINION EVIDENCE

On January 16, 2014, Dr. Gorelick authored a letter in connection with the plaintiff's short-term disability claim. (Tr. 327-38). Dr. Gorelick wrote that the plaintiff "remain[ed] symptomatic of back and right leg pain"; "[h]er back pain ha[d] increased relative to [her] leg pain." (Tr. 327). She summarized her diagnosis as a "a small, recurrent, right L5-S1 disk herniation with postoperative changes," and noted that she discharged the plaintiff after she did not wish to move forward with surgical treatment. (*Id.*). Dr. Gorelick opined that the plaintiff was "capable of work in a light-duty capacity with a 10-pound to 15-pound lifting restriction." (*Id.*). She noted that "[a]s the patient does not presently have any intention of moving forward with surgical intervention, and she ha[d] failed nonoperative measures of treatment, she [had] reached a point of maximum medical improvement relative to her work injury." (*Id.*). She would fall into the "Lumbar Spine

Regional Grid for Motion Segment Lesions Class ½, with a 10% permanent partial impairment rating to the lumbar spine." (Tr. 328).

The plaintiff saw Dr. Mallick Q. Alam for a consultative examination on June 20, 2017. (Tr. 1226-32). She reported muscle spasm, sciatica pain, back pain, "burning in [her] right," and "Charley horse in [her] right foot." (Tr. 1226). She stated she had "difficulty in moving." (*Id.*). She reported difficulty driving, that she "[could not] bend," and that she would get muscle spasms "[i]f she [stood] or [sat] for any extended period of time." (Tr. 1227). She also had neck pain. (*Id.*). The plaintiff reported to Dr. Alam that her physician recommended she return to work with limitations including not to lift more than ten pounds, but her employer could not "accomplish that." (*Id.*). She had been on pain medication and a muscle relaxant for her back and right lower extremity discomfort since refusing to undergo further surgery. (*Id.*). She had "[p]ositive stiffness" and pain in her upper back and back of the neck region, pain which radiated down to her right lower extremities, and, according to her, in some instances, pain in her back which also radiated to her left lower extremity. (Tr. 1228). She had no swelling or tenderness in any other musculoskeletal area. (*Id.*). According to the plaintiff, her right foot "[felt] numb, asleep." (*Id.*).

On examination, she had full range of motion in her head and neck, with no tenderness or swelling; she had "[s]omewhat limited or restricted range of motion in [her] lumbosacral spine because of excruciating pain . . . on bending forward"; and a seated straight leg raising test was negative bilaterally. (Tr. 1228-1229). She could get on and off the examining table without support. (Tr. 1228). She had full range of motion in her upper and lower extremities with complaints of discomfort in her neck and right lower extremity. (Tr. 1229). Her gait was stable without support, she could walk on her heels and toes, and she could partially squat. (*Id.*). Dr. Alam assessed "[c]hronic lower back pain that radiates down to her right leg," and "sciatica type

of pain in her leg or Charley horse kind of pain in her right foot." (*Id.*). He stated the following in the section of his report labeled Medical Source Statement: "In my opinion . . . the claimant's ability to participate or perform in any work-related physical activities at the present time must or shall follow the instructions given by her orthopedic physician." (Tr. 1230).

State agency reviewer Dr. Samuel Bridgers, M.D., opined on July 6, 2017 that the plaintiff could occasionally lift and carry up to twenty pounds, and she could frequently lift and carry up to ten pounds. (Tr. 79). She could stand and walk, with normal breaks, for four hours, and she could sit, with normal breaks, for about six hours in an eight-hour workday. (*Id.*). He found no additional limitations in pushing or pulling, including operation of hand or foot controls. (*Id.*). He opined that the plaintiff could occasionally climb ramps and stairs, could occasionally climb ladders, ropes and scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 80). He found that the plaintiff did not have any manipulative, visual, communicative or environmental limitations. (*Id.*).

On August 12, 2017, state agency review Dr. Henry Scovern, M.D., opined to the substantially the same limitations. (Tr. 90-92). The only difference was his finding that the plaintiff could stand and walk, with normal breaks, for six hours in an eight-hour workday. (Tr. 91).

D.    <u>THE ALJ'S DECISION</u>

Following the five-step evaluation process,[3] the ALJ found that the plaintiff's date last insured under the Social Security Act was September 30, 2018, (Tr. 17), and that the plaintiff had

---

[3] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or

not engaged in substantial gainful activity since February 19, 2013, her alleged onset date. (Tr. 17, citing 20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ concluded that the plaintiff had the severe impairment of "degenerative disc disease lumbar spine status post decompression with sciatica," (Tr. 17, citing 20 C.F.R. § 404.1520(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17-18, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). He also found that the plaintiff's anxiety was a nonsevere impairment. (Tr. 18).

The ALJ then concluded, after careful consideration of the entire record, that the plaintiff had the residual functional capacity ["RFC"] to perform sedentary work, but with the following limitations: "she [could not] climb ladders, ropes or scaffolds," she "[could] perform other postural activities only occasionally," "she must avoid exposure to higher concentrations of vibrations," and "she [could] tolerate no more than occasional exposure to extremes of cold." (Tr. 19).

At step four, the ALJ concluded that the plaintiff was unable to perform any past relevant work. (Tr. 24, citing 20 C.F.R. § 404.1565), and at step five, the ALJ found that the plaintiff could perform work as an addresser, ticket checker, or order clerk. (Tr. 25). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from February 19, 2013, through the date of the decision, May 1, 2018. (Tr. 25-26, citing 20 C.F.R. § 404.1520(g)).

III.    STANDARD OF REVIEW

---

equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

IV.     <u>DISCUSSION</u>

The plaintiff first argues that that the ALJ committed legal error by minimizing the plaintiff's condition and treatment, mistaking the plaintiff's inability to undergo further surgery as "contentment," and confusing the plaintiff's desire for more children with her ability to work. (Pl.'s Mem. at 9-12). The plaintiff also claims that the ALJ improperly evaluated the opinion of consultative examiner, Dr. Alam. (*Id*. at 12-14). Finally, the plaintiff maintains that the ALJ should have included limitations based on the plaintiff's "slowed movements, off-task behavior, and a sit/stand [option]" in the RFC determination. (*Id*. at 14-16). The defendant responds that the ALJ properly assessed the medical evidence, including the opinion evidence, and properly evaluated the plaintiff's symptoms in determining the RFC. (Def.'s Mem. at 2).

A.     THE ALJ DID NOT ERR IN HIS EVALUATION OF THE EVIDENCE

The plaintiff first argues that the ALJ cherry-picked and mischaracterized the evidence. Specifically, she argues that the ALJ erred by minimizing the plaintiff's condition and treatment, mistaking the plaintiff's inability to undergo further surgery as "contentment," and confusing the plaintiff's desire for more children with her ability to work. (Pl.'s Mem. at 9-12).

Taking each in turn, the plaintiff writes that the "ALJ minimized [the plaintiff's] condition and . . . treatment" when he stated that her treatments "have been primarily routine and conservative." (Pl.'s Mem. at 9-10 (citing Tr. 22)). The plaintiff notes that she has had spinal surgery and injections and that physicians have recommended she undergo further surgery. (Pl.'s Mem. at 10). She does not provide any further argument. The plaintiff appears to be taking issue with the ALJ's use of the term "conservative," not arguing that the ALJ ignored the plaintiff's relevant medical history.

Indeed, in his decision, the ALJ noted that the plaintiff had surgery in November 2012, attended physical therapy, and had spinal injections. (Tr. 20). The ALJ also referenced her

physicians' recommendations that she have further surgery. (*See* Tr. 20-21 ("The record indicates that three separate physicians recommended surgery, including Dr. Whang in May 2013, Dr. Gorelick in May 2013, and Dr. Kramer in September 2016")). After citing the plaintiff's medical records, the ALJ noted that the plaintiff's "treatments . . . have been primarily routine and conservative." (Tr. 22). He noted that "she has been continued on only conservative care, such as physical therapy, medications, and spinal injections," a statement supported by the medical records, which reflect only one surgery in November 2012. (*See* Tr. 269). Accordingly, under these facts, the Court finds no error in the ALJ's analysis warranting remand.

Additionally, the plaintiff argues that the ALJ "mistook [the plaintiff's] inability to undergo further surgery as 'contentment.'" (Pl.'s Mem. at 10). The plaintiff acknowledged that the ALJ cited the plaintiffs' three physicians' recommendations that she undergo further surgery, as well as the reasons given by the plaintiff for not having surgery. (Pl.'s Mem. at 10). Specifically, the ALJ noted that the plaintiff chose not to undergo surgery because "she was not emotionally ready for surgery due to the recent passing of her father," and she had "some financial issues." (Tr. 23). The plaintiff, however, then argues that the ALJ "should have explored [the plaintiff's] reasons for not undergoing further spinal surgery." (Pl.'s Mem. at 10). She cites cases standing for the proposition that an ALJ must first explore a plaintiff's reasons for lack of medical care before drawing a negative inference. (Pl.s Mem. at 10 (citing *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267-68 (11th Cir. 2015))).

These cases are inapposite here. In *Shauger*, the Seventh Circuit found that the ALJ erred by making a negative credibility assessment of the plaintiff based on the plaintiff's treatment history because the ALJ had made no effort to question the plaintiff or otherwise address "perceived gaps in his treatment history." *Shauger*, 675 F.3d at 696. The Court found that the ALJ

must first explore the plaintiff's reasons for the lack of medical care before drawing a negative inference. *Id.* In *Henry*, the Eleventh Circuit found that the ALJ erred by "basing the credibility of [a physician's] opinion on a negative inference, drawn from [the plaintiff's] failure to seek additional medical treatment." *Henry*, 802 F.3d at 1268. In that case, the plaintiff had stated that he was unable to pay for continued medical treatment, and the ALJ did not address the plaintiff's financial excuse. *Id.*

The issue in the instant case is the ALJ's evaluation of the plaintiff's medical history, including her reluctance to undergo surgery, not whether the plaintiff failed to seek medical treatment at all. Here, the ALJ simply pointed out that the plaintiff elected not to undergo surgery because she was "not emotionally ready for" it and had "some financial issues." (Tr. 23). Moreover, the ALJ's finding that the plaintiff "has been content with conservative treatment, which indicates that the symptoms [were] not as severe as alleged," (Tr. 22), is directly supported by the medical records. In support of this statement, the ALJ cited Exhibit 12F, which is Dr. Kramer's treatment notes from 2016 and 2017. (Tr. 22, 1367-85). These treatment notes reflected the plaintiff's "contentment" not to undergo surgery. (*See* Tr. 1367 (treatment notes from July 24, 2017; Dr. Kramer discussed discectomy, but the plaintiff was "for now content"); Tr. 1369 (treatment notes from November 10, 2016; the plaintiff was "content to follow [nonsurgical] measures for now"); Tr. 1371 (treatment notes from September 28, 2016; Dr. Kramer discussed surgery, but the plaintiff was "content to follow for now on medications")). The ALJ's use of the word "content" was thus taken straight from Dr. Kramer's treatment notes. (Tr. 1367, 1369, 1371). Social Security Ruling 16-3p allows an ALJ to consider an individual's failure to follow prescribed treatment in determining that an individual's alleged symptoms are inconsistent with the overall evidence of record. *See White v. Berryhill*, No. 17-CV-1310 (JCH), 2018 WL 2926284 (D. Conn.

June 11, 2018) ("Under SSR 16-3p, an ALJ may conclude that 'the alleged intensity and persistence of an individual's symptoms' are 'inconsistent with the overall evidence of record' if the claimant is not following prescribed treatment and there are no good reasons for this failure.")). Accordingly, for the above reasons, the Court similarly finds no error here.

Finally, the plaintiff argues that the ALJ "confused [the plaintiff's] desire for more children with her ability to work." (Pl.'s Mem. at 11). The ALJ found that the plaintiff's "allegation that she is incapable of full-time work due to her physical impairments is also inconsistent with her plans to have more children." (Tr. 23). He stated: "While the undersigned certainly does not fault the [plaintiff] for possibly wanting to have more children, this evidence nevertheless does not support her testimony that she is unable to care for her children without substantial assistance from others due to her medical conditions." (Tr. 23). The ALJ thus cited these statements as evidence that the plaintiff was not as limited as she testified. This Court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* It was not unreasonable for the ALJ to find that the plaintiff's plans to have more children were inconsistent with her allegation that she was incapable of full-time work, even if, as the plaintiff argues, having more children was only "a dream." (Pl.'s Mem. at 11). Accordingly, remand is not warranted.

B.    THE ALJ PROPERLY EVALUATED THE OPINION EVIDENCE

The Court agrees with the defendant that the ALJ did not err by assigning great weight to Dr. Alam's opinion. As noted above, the plaintiff saw Dr. Alam for a consultative examination on June 20, 2017. (Tr. 1226-32). Dr. Alam's report from that examination noted that the plaintiff reported that her physician had recommended she return to work in February 2013 with limitations

including that she not lift more than ten pounds "but her employer could not accomplish that." (Tr. 1227). She had "[p]ositive stiffness" and pain in her upper back and back of the neck region, pain which radiated down to her right lower extremities. (Tr. 1228). Her right foot also "[felt] numb, asleep." (*Id.*). She had "[s]omewhat limited or restricted range of motion in [her] lumbosacral spine because of excruciating pain . . . on bending forward"; a seated straight leg raising test was negative bilaterally. (Tr. 1228-1229). She could get on and off the examining table without support. (Tr. 1228). She had full range of motion in her upper and lower extremities. (Tr. 1229). Her gait was stable without support, she could walk on her heels and toes, and she could partially squat. (*Id.*). Dr. Alam assessed her with "[c]hronic lower back pain that radiates down to her right leg," and "sciatica type of pain in her leg or Charley horse kind of pain in her right foot." (*Id.*). He opined that she should "follow the instructions given by her orthopedic physician." (Tr. 1230).

The ALJ afforded "great weight" to Dr. Alam's opinion. (Tr. 23). The ALJ noted that, according to Dr. Alam's conclusion, the plaintiff "should follow the instructions given by her orthopedic physician regarding her capacity to work"; the ALJ interpreted those instructions as a limitation to sedentary work. (*Id.*) The ALJ stated that the plaintiff had "reported to Dr. Alam that her physician recommended returning to work with a limitation to lift no more than ten pounds." (*Id.*).[4] The ALJ also referred to a February 28, 2013 form that Dr. Kramer completed, in which he recommended that the plaintiff could return to work at a sedentary exertional level. (*Id.*). The ALJ then stated that "Dr. Alam's opinion that the [plaintiff] [could] work at the sedentary level [was] consistent with the findings of his examination, which indicated full range of motion in [her] extremities, no acute inflammation, and a normal gait." (*Id.*). The plaintiff argues that the ALJ's finding was in error because "Dr. Alam does not list any functional limitations, and instead defers

---

[4] A lifting limitation of ten pounds is consistent with sedentary work. *See* 20 C.F.R. § 404.1567(a).

to [the plaintiff's] treating physicians." (Pl.'s Mem. at 13). She argues that Dr. Alam did not define what the plaintiff's physician's instructions were or offer his own professional opinion. (*Id.*). Thus, it was error for the ALJ to interpret Dr. Alam's opinion as restricting her to sedentary work.

Here, Dr. Alam's report noted that the plaintiff's physician had recommended that she return to work with limitations including not lifting more than ten pounds. (Tr. 1227). As noted above, a lifting limitation of ten pounds is consistent with sedentary work. *See* 20 C.F.R. § 404.1567(a). Moreover, Dr. Alam indicated that he reviewed the plaintiff's medical records. (*See* 1230 (stating "As per medical records, patient carries the diagnosis of herniated disc, nerve impingement" and "In my opinion based on . . . medical records if they were available also reviewed by me")). The plaintiff's medical records consistently reflect limitations to sedentary work from Dr. Kramer, though he last limited her to sedentary work in February 2013. (*See* Tr. 249, 257, 258, 261, 266, 268, 285, 286, 291). In January 2014, Dr. Gorelick opined that the plaintiff was "capable of work in a light-duty capacity with a 10-pound to 15-pound lifting restriction." (Tr. 327). The record does not contain any other physician instructions regarding the plaintiff's ability to perform "work-related physical activities." (Tr. 1230). Thus, both the plaintiff's reporting, and the medical records, do not reflect any physician opinion limiting the plaintiff to less than sedentary work. It was therefore reasonable for the ALJ to interpret Dr. Alam's statement—that she should "follow the instructions given by her orthopedic physician"— as adopting a limitation to sedentary work. *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld"). Accordingly, the Court finds no error of law in the ALJ's treatment of the opinion evidence.

C.    SUBSTANTIAL EVIDENCE SUPPORTS THE RFC ASSESSMENT

The plaintiff argues that the ALJ's RFC determination should have included limitations based on the plaintiff's "slowed movements, off-task behavior, and a sit/stand [option]." (Pl.'s Mem. at 14-16). The defendant argues that substantial evidence supports the ALJ's findings as to the plaintiff's RFC. (Def.'s Mem. at 5-11).

The plaintiff's RFC is "the most she can still do despite her limitations" and is determined "based on all the relevant evidence in [the] case record[,]" namely, "all of the relevant medical and other evidence." 20 C.F.R. § 404.1527(a)(1), (3); *see also Gonzales v. Berryhill*, No. 3:17-CV-1385 (SALM), 2018 WL 3956495, at *14 (D. Conn. Aug. 17, 2018). "[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Social Security Ruling ["S.S.R."] 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). Before classifying a plaintiff's RFC based on exertional level, an ALJ "must first identify the individual's functional limitations or restrictions and assess [] her work-related abilities on a function-by-function basis[]." *Id.* (internal quotation marks omitted).

However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id.* at 178 n. 3 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order) (citing 42 U.S.C. § 405(g)); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, as discussed above, the ALJ concluded, after careful consideration of the entire record, that the plaintiff had the RFC to perform sedentary work,[5] but with the following

---

[5] Sedentary work as defined by 20 C.F.R. § 404.1567(a) involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). "Although

limitations: "she [could not] climb ladders, ropes or scaffolds," she "[could] perform other postural activities only occasionally," "she must avoid exposure to higher concentrations of vibrations," and "she [could] tolerate no more than occasional exposure to extremes of cold." (Tr. 19).

Substantial evidence supports the ALJ's RFC assessment. The ALJ's RFC findings are supported by the treatment notes, Dr. Gorelick's January 2014 opinion, the opinion of consultative examiner Dr. Alam, and the opinions of state agency examiners Drs. Bridgers and Scovern.

First, the treatment notes are consistent with the level of functioning the ALJ assessed in his decision. Nothing in the treatment notes suggests that the ALJ should have imposed additional exertional limitations. The plaintiff consistently had full strength in her extremities. (*See* Tr. 317-18 (full strength throughout her lower extremities in May 2013); Tr. 321 (neurological examination in July 2013 showed "good strength throughout"); Tr. 323 (full strength in the lower extremities in October 2013); Tr. 325 (normal power in her lower extremities in January 2014); Tr. 1233 (no weakness upon neurological examination in June 2014); Tr. 336 (five out of five strength in her lower extremities in October 2015). Moreover, the plaintiff testified that she could carry a gallon of milk. (Tr. 49). The plaintiff also did not have significant problems ambulating. While early treatment notes reflect that she walked with an antalgic gait, they do not indicate that her gait problems were severe. (*See* Tr. 306-08 (antalgic gait in April 2013); Tr. 303-05 (antalgic gait in May 2013); Tr. 320-22 (mildly antalgic gait in July 2013); Tr. 323-24 (steady gait in October 2013); Tr. 325-26 (antalgic gait in January 2014); Tr. 1247-79 (normal gait in June 2015); Tr. 336 (mildly antalgic gait in October 2015); Tr. 344 (ambulated "well" in May 2016); Tr. 345 (normal

---

a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* "Occasionally" means occurring from very little up to one-third of the time." Diaz v. Astrue, No. 11-CV-317 (VLB) (TPS), 2012 WL 3903388, at * 6 (D. Conn. Aug. 2, 2012) (citing Social Security Ruling (SSR) 83-10)).

wait in July 2016); Tr. 352 (satisfactory gait pattern in September 2016); Tr. 354 (normal gait in October 2016); Tr. 353 (normal gait in November 2016)). The ALJ accounted for this limitation in the RFC by limiting the plaintiff to sedentary work. Moreover, the plaintiff testified that she could stand for "[m]aybe half hour, 45 minutes" if she had "something to lean against," and she could walk "on a nice flat area" for "20 minutes or so." (Tr. 46).

The treatment notes also do not reflect that the plaintiff's range of motion of her lumbar spine was severe except for in May 2013. (*See* Tr. 306-08 ("significantly limited range of motion of [her] lumbar spine" in April 2013); Tr. 303-05 ("severely limited range of motion of her lumbar spine" in May 2013); Tr. 1234 (good range of motion of the plaintiff's "trunk" in June 2014); Tr. 1247-79 (limited range of motion in her lumbar spine in June 2015); Tr. 336 (full range of motion of her lower extremities in October 2015); Tr. 341 (the plaintiff's "lumbar motion improved with less pain" in February 2016); Tr. 344 (her lumbar motion was "satisfactory" in May 2016); Tr. 345 (lumbar motion was "in the satisfactory range" in July 2016); Tr. 353 (motion satisfactory in November 2016)). Finally, the treatment notes reflect that the plaintiff's sciatica improved with treatment. (*See* Tr. 341 ("diminished sciatic stretch signs" in February 2016); Tr. 343 (the plaintiff reported that her symptoms had improved with medications; "right sciatica . . . has now fully resolved aside from residual intermittent toe numbness" in April 2016); Tr. 344 (in May 2016, the plaintiff reported that her "sciatic[a] [had] favorably much improved with minimal symptoms"); Tr. 345 (in July 2016, the plaintiff reported that the sciatica remained absent); Tr. 353 (in November 2016, the plaintiff reported "fluctuating levels of symptoms which have been a bit more manageable"); Tr. 1368 (reported escalation of sciatica in the "past few weeks" in May 2017); Tr. 1367 (reported in July 2017 that the sciatica flareup "had subsided").

Further, the diagnostic evidence from the plaintiff's October 19, 2015 MRI and her August 5, 2016 examination does not support more than the imposed limitations. (*See* Tr. 347 (August 5, 2016 examination under fluoroscopy revealed osteoarthritis of the spine without myelopathy or radiculopathy[6] in the thoracolumbar region); Tr. 339 (October 19, 2015 MRI of the plaintiff's lumbar spine showed "[d]egenerative change with large posterior right paramidline disc extrusion at the L5-S1 level" but no "spondylolisthesis"[7])). Moreover, Dr. Kramer, the plaintiff's treating physician, cleared her for sedentary work in April 2012, May 2012, June 2012, September 2012, October 2012, January 2013, and February 2013. (Tr. 249, 251, 253-54, 266, 268, 285, 291). In January 2014, Dr. Gorelick, also one of the plaintiff's treating physicians, opined that the plaintiff was capable of work in a light-duty capacity with a ten to fifteen-pound lifting restriction. (Tr. 327). These findings support the ALJ's RFC assessment.

The ALJ's conclusion that the plaintiff could do sedentary work with additional limitations is also supported by Dr. Alam's findings and conclusions. Dr. Alam's opinion may provide substantial evidence in support of the ALJ's RFC assessment. *See Petrie v. Astrue*, 412 Fed. App'x 401, 405 (2d Cir. 2011) ("The report of a consultative physician may constitute . . . substantial evidence.") (citing *Mongeur*, 722 F.2d at 1039). Dr. Alam examined the plaintiff and found that she had full range of motion in her head and neck, with no tenderness or swelling; she had "[s]omewhat limited or restricted range of motion in [her] lumbosacral spine because of excruciating pain . . . on bending forward"; and a seated straight leg raising test was negative bilaterally. (Tr. 1228-1229). She could get on and off the examining table without support. (Tr.

---

[6] Radiculopathy is the term used to describe pinching of the nerve roots as they exit the spinal cord or cross the intervertebral disc. Myelopathy is the term used to describe compression of the spinal cord itself. *Myelopathy*, JOHN HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy (last visited March 17, 2020).

[7] Spondylolisthesis is a condition in which a bone (vertebra) in the spine moves forward out of the proper position on to the bone below it. *Spondyloslisthesis*, MEDLINE PLUS, https://medlineplus.gov/ency/article/001260.htm (last visited March 17, 2020).

1228). She had full range of motion in her upper and lower extremities with complaints of discomfort in her neck and right lower extremity. (Tr. 1229). Her gait was stable without support, she could walk on her heels and toes, and she could partially squat. (*Id.*). These findings are consistent with the treatment notes discussed above, which reflect that the plaintiff consistently had full strength in her extremities, limited range of motion of her lumbar spine, and no serious problems ambulating, with a generally normal or mildly antalgic gait.

The ALJ's RFC assessment is also supported by the opinions of the state agency physicians. Dr. Bridgers opined that the plaintiff could occasionally lift and carry twenty pounds; could frequently lift and carry ten pounds; could stand/walk, with normal breaks, for four hours; could sit, with normal breaks, for about six hours in an eight-hour workday; could occasionally climb ramps, stairs, ladders, ropes and scaffolds; and could occasionally balance, stoop, knee, crouch and crawl. (Tr. 79-80). Dr. Scovern opined to substantially the same limitations, except that he opined that the plaintiff could stand and walk, with normal breaks, for six hours in an eight-hour workday. (Tr. 90-92). The ALJ incorporated these findings into his RFC assessment, giving the opinions both "partial weight," but finding additional limitations based on the record as whole.

The ALJ thus accounted for the plaintiff's physical limitations in the RFC by concluding that she was limited to sedentary work with additional limitations. As discussed above, the treatment notes and physician opinions do not support more significant restrictions, including, as the plaintiff suggests, a sit/stand option or a limitation for slowed movements and off-task behavior. No physician opined that the plaintiff needed such limitations. Further, as discussed above, while the plaintiff testified to being able to sit for only thirty minutes before needing to "[g]et up, move around" for "probably ten minutes or so," (Tr. 45-46), the ALJ did not err in finding that "the plaintiff alleged symptoms suggesting a greater level of severity of impairment

than can be shown by the objective medical evidence alone." (Tr. 21). This Court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo*, 142 F.3d at 79; *see also Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) ("[W]hether there is substantial evidence supporting the [plaintiff's] view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision"). Thus, contrary to the plaintiff's argument, the ALJ did not err in failing to include a sit/stand option or a limitation for slowed movements and off-task behavior.

Therefore, as discussed above, the Court finds that the ALJ did not err in his decision, and the ALJ's RFC assessment is supported by substantial evidence. *See Hanson v. Comm'r of Soc. Sec.*, No. 15-CV-150 (GTS) (WBC), 2016 WL 3960486, at *12 (N.D.N.Y. June 29, 2016) ("Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence . . . Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record."), *report and recommendation adopted sub nom. Hanson v. Colvin*, No. 15-CV-150 (GTS) (WBC), 2016 WL 3951150 (N.D.N.Y. July 20, 2016)).

V.    <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is *denied*, and the defendant's Motion to Affirm (Doc. No. 15) is *granted.*

Dated this 20th day of March, 2020 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge